**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF ALABAMA**
**SOUTHERN DIVISION**

| | |
|---|---|
| **FRANK DAVID RIORDAN, etc.,** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| **v.** | ) **CIVIL ACTION 09-0716-WS-M** |
| | ) |
| **ALLEN O'SHEA,** | ) |
| | ) |
| **Defendant.** | ) |

## ORDER

This matter is before the Court on the defendant's motion for summary judgment. (Doc. 16). The parties have submitted briefs and evidentiary materials in support of their respective positions, (Docs. 17, 19, 20), and the motion is ripe for resolution. After carefully considering the foregoing, the Court concludes that the motion is due to be granted.

## BACKGROUND

On the night of November 4, 2007, Channing Lee Riordan ("Channing") was shot dead in his backyard by defendant Allen O'Shea, a Mobile County deputy sheriff. The amended complaint, brought by Channing's father in a representative capacity, alleges that O'Shea employed excessive force in the course of effecting an arrest, seizure or investigatory stop, in violation of the Fourth and Fourteenth Amendments. (Doc. 5).[1]

---

[1] The plaintiff's brief limits his claim to one for excessive force under the Fourth Amendment. (Doc. 19 at 7). The parties do not question that the shooting of Channing constitutes a seizure for purposes of the Fourth Amendment. *See Tennessee v. Garner*, 471 U.S. 1, 7 (1985) (a seizure occurs "[w]henever an officer restrains the freedom of a person to walk away," including "apprehension by the use of deadly force").

O'Shea argues that he did not violate Channing's constitutional rights and that he is protected by qualified immunity.

## DISCUSSION

The Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2).

Summary judgment should be granted only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir. 1991). The moving party may meet its burden in either of two ways: (1) by "negating an element of the non-moving party's claim"; or (2) by "point[ing] to materials on file that demonstrate that the party bearing the burden of proof at trial will not be able to meet that burden." *Id*. "Even after *Celotex* it is never enough simply to state that the non-moving party cannot meet its burden at trial." *Id*.; *accord Mullins v. Crowell*, 228 F.3d 1305, 1313 (11th Cir. 2000); *Sammons v. Taylor*, 967 F.2d 1533, 1538 (11th Cir. 1992).

"If the party moving for summary judgment fails to discharge the initial burden, then the motion must be denied and the court need not consider what, if any, showing the non-movant has made." *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *accord Mullins*, 228 F.3d at 1313; *Clark*, 929 F.2d at 608.

"If, however, the movant carries the initial summary judgment burden ..., the responsibility then devolves upon the non-movant to show the existence of a genuine issue of material fact." *Fitzpatrick*, 2 F.3d at 1116. "If the nonmoving party fails to make 'a sufficient showing on an essential element of her case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *Clark*, 929 F.2d at 608 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986)) (footnote omitted);

*see also* Fed. R. Civ. P. 56(e)(2) ("If a party fails to properly support an assertion of fact or fails to properly address another party's assertion of fact as required by Rule 56(c), the court may … consider the fact undisputed for purposes of the motion ….").

In deciding a motion for summary judgment, "[t]he evidence, and all reasonable inferences, must be viewed in the light most favorable to the nonmovant …." *McCormick v. City of Fort Lauderdale*, 333 F.3d 1234, 1243 (11th Cir. 2003).

"There is no burden upon the district court to distill every potential argument that could be made based upon the materials before it on summary judgment." *Resolution Trust Corp. v. Dunmar Corp.*, 43 F.3d 587, 599 (11th Cir. 1995).

For purposes of the pending motion, the following facts are uncontroverted. O'Shea was on duty as a deputy at approximately 9:30 p.m. when he was dispatched to what was described to him as a domestic violence situation. He drove his vehicle to the Riordan residence and parked in front, where Regina Riordan, Channing's wife, met him. Regina and/or the dispatcher informed O'Shea that Channing had been drinking for three days, was presently intoxicated, and that he had destroyed the interior of the Riordan manufactured home. Regina also informed O'Shea that she had hidden Channing's gun under the bed but did not know whether Channing had found it. Regina told O'Shea that Channing was insisting that his seven-year-old son, Zack, leave with Channing in his truck, which was parked in back of the home, and that she was fearful he would harm the child in his intoxicated state. (O'Shea Deposition at 21, 37-39; O'Shea Statement at 3; Regina Deposition at 37, 55).

O'Shea intended to enter the back yard by crossing through the home, but Regina denied him permission to do so, because she feared Channing might be inside. O'Shea crossed to the right (north) side of the manufactured home but did not enter the back yard. Channing's truck was parked in the back, facing south, some distance from the home. Regina remained in the front yard, where she could see O'Shea but not Channing or his truck, due to the home blocking her view. (Regina Deposition at 38, 41-42, 76).

The Riordan's only lights for the back of their property were two 60-watt bulbs on the back of the manufactured home, which were on. O'Shea used his flashlight to improve visibility. When he shined his light at the truck, he could see Zack standing by the passenger side. He told Zack to come to him, and Zack did so. O'Shea turned his head to the right but his peripheral vision caught movement to the left. (O'Shea Deposition at 14; O'Shea Statement at 3; Regina Deposition at 39, 43, 63).

O'Shea shined his light in that direction and saw Channing charging toward him at a dead run from the truck. Channing held something shiny in his right hand and raised it and waved it like a knife or machete as he ran directly toward O'Shea. O'Shea could not determine what the object was but believed it to be a tire tool. As he advanced, Channing yelled in what Regina recognized as an enraged voice, "You motherfucker, I'm going to kill you." (O'Shea Deposition at 10, 15,19-20, 26, 37; O'Shea Statement at 3, 5, 6, 8, 10, 12; Regina Deposition at 50, 54, 65).

O'Shea attempted a retreat but stumbled over an exposed tree root as Channing rapidly advanced. O'Shea drew his weapon and fired twice, but not from a shooting stance. One bullet struck Channing in the head, and he immediately fell. He died shortly thereafter. The object in Channing's hand turned out to be a one-to-two-foot spindle from a kitchen chair he had broken earlier in the evening, which was painted green. (O'Shea Deposition at 12, 20, 35, 37; O'Shea Statement at 4; Regina Deposition at 66).

Before firing, O'Shea did not identify himself as a law enforcement officer and did not issue a warning to Channing. (O'Shea Deposition at 24-25; Regina Deposition at 62-64).

The distance between O'Shea and Channing when O'Shea first saw him was approximately 35 feet. The distance between O'Shea and Channing when O'Shea fired was approximately 10-15 feet. O'Shea had barely one second to react to the charging Channing. (O'Shea Deposition at 13-14, 15, 19-20, 25-26; O'Shea Statement at 11).

"[G]overnment officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly

[4]

established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). "[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority." *Harbert International, Inc. v. James*, 157 F.3d 1271, 1281 (11th Cir. 1998). The burden then shifts to the plaintiff to show that the defendant's conduct "violated a clearly established statutory or constitutional right." *Grayden v. Rhodes*, 345 F.3d 1225, 1231 (11th Cir. 2003). The inquiry may be broken down into two parts: (1) whether the facts alleged, if true, would establish a violation of the plaintiff's rights; and (2) whether these rights were clearly established at the time of the alleged deprivation. *Id.*

"[T]he burden is first on the defendant to establish that the allegedly unconstitutional conduct occurred while he was acting within the scope of his discretionary authority. ... If, and only if, the defendant does that will the burden shift to the plaintiff to establish that the defendant violated clearly established law." *Harbert International*, 157 F.3d at 1281 (emphasis added). The reason is that an official acting outside the scope of his discretionary authority "ceases to act as a government official and instead acts on his own behalf," so that "the policies underlying the doctrine of qualified immunity no longer support its application." *Id*.

For purposes of federal qualified immunity analysis, a defendant acts within his discretionary authority when "his actions were undertaken pursuant to the performance of his duties and within the scope of his authority." *Rich v. Dollar*, 841 F.2d 1558, 1564 (11th Cir. 1988) (internal quotes omitted). That is, "[w]e ask whether the government employee was (a) performing a legitimate job-related function (that is, pursuing a job-related goal), (b) through means that were within his power to utilize." *Holloman ex rel. Holloman v. Harland*, 370 F.3d 1252, 1265 (11th Cir. 2004). "The inquiry is not whether it was within the defendant's authority to commit the allegedly illegal act," but "whether the act complained of, if done for a proper purpose, would be within, or reasonably related to, the outer perimeter of an official's discretionary duties." *Harbert*

*International*, 157 F.3d at 1282 (internal quotes omitted).  For example, the issue is not whether a marshal has the authority to deliver a prisoner into unconstitutional conditions but whether he has the authority to transport and deliver prisoners.  *Id.* (describing *Jordan v. Doe*, 38 F.3d 1559, 1566 (11th Cir. 1994)).

It is uncontroverted that O'Shea was an on-duty deputy sheriff responding to a dispatch when the incident occurred.  He was investigating a domestic complaint and was rescuing a seven-year-old child from his intoxicated, enraged father when he was attacked by the father.  There is no question but that O'Shea was acting within his discretionary authority at the time of the shooting,[2] and the plaintiff offers no protestation to the contrary.

The right to arrest carries with it the right to use physical coercion or its threat in order to effect the arrest, and an arrest typically "involves some force and injury."  *Reese v. Herbert*, 527 F.3d 1253, 1272 (11th Cir. 2008) (internal quotes omitted).  Nevertheless, "[i]t is clearly established that the use of excessive force in carrying out an arrest constitutes a violation of the Fourth Amendment."  *Davis v. Williams*, 451 F.3d 759, 767 (11th Cir. 2006).  "In determining whether the officers' force was reasonable, we must determine whether a reasonable officer would believe that this level of force is necessary in the situation at hand."  *Mercado v. City of Orlando*, 407 F.3d 1152, 1157 (11th Cir. 2005) (internal quotes omitted).  This is an objective standard.  *Id.*  What is required is a balancing of the "nature and quality of the intrusion against the governmental interest at stake."  *Id.* (internal quotes omitted).  Assessment of the governmental interest requires a consideration of factors "that include the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight."  *Id.* (internal quotes

---

[2] *See Harris v. City of Prattville*, 2008 WL 2704684 at *3, 11 (M.D. Ala. 2008) (officer who injured a citizen while investigating a domestic disturbance call was acting within his discretionary authority); *Magee v. City of Daphne*, 2006 WL 3791971 at *3, 6 (S.D. Ala. 2006) (similar).

omitted). In making this determination, "we must allow for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain and rapidly evolving – about the amount of force that is necessary in a particular situation." *Pace v. Capobianco*, 283 F.3d 1275, 1281 (11th Cir. 2002) (internal quotes omitted).

The nature and quality of the intrusion was death, the most extreme possible. That side of the scale thus weighs heavily in favor of the plaintiff. The plaintiff stresses that O'Shea was not attempting to arrest Channing or conduct an investigatory stop of Channing and that O'Shea did not believe that any crime had been committed. (Doc. 19 at 12-14). It may be assumed that Channing was not actively resisting or evading arrest, since no arrest was contemplated by O'Shea. The parties identify no factors by which to measure O'Shea's use of force beyond the three listed above, so the question becomes whether the degree of threat that Channing posed to O'Shea made O'Shea's use of deadly force objectively reasonable. O'Shea accepts that this requires him to show that, "given the circumstances, [Channing] would have appeared to reasonable police officers to have been gravely dangerous." (Doc. 17 at 7 (quoting *Pace*, 283 F.3d at 1281)). Similarly, "it is also constitutionally reasonable for an officer to use deadly force when he has probable cause to believe that his own life is in peril." *Robinson v. Arrugueta*, 415 F.3d 1252, 1256 (11th Cir. 2005).

As noted, O'Shea knew that Channing was intoxicated, enraged, destructive, erratic and possibly in possession of a firearm. Channing then suddenly appeared out of the dimness, running full tilt at O'Shea from a distance of barely ten yards, swinging a weapon and screaming that he would kill O'Shea. O'Shea had almost no time to react, yet he tried retreat before employing the only alternative left to him. To a reasonable police officer facing these circumstances – including the tiny increment of time available to assess the situation and weigh options – Channing would have appeared to be gravely dangerous. Likewise, O'Shea had probable cause to believe his own life was in peril.

The cases cited by the plaintiff support the entry of summary judgment in this case. *See, e.g., Robinson*, 415 F.3d at 1254, 1256 (no constitutional violation when an officer with less than three seconds to avoid being crushed between two cars shot the driver of the moving car); *Vaughn v. City of Orlando*, 2011 WL 353237 at *3 & n.3 (11th Cir. 2011) (no constitutional violation where an officer shot the decedent without warning after hearing shots being fired, seeing the decedent (who turned out to be an undercover law enforcement officer) poised to shoot at a citizen who was lying shot or injured, and noting that a crowd of bystanders was present).

The plaintiff's opposition to summary judgment depends primarily on a version of the facts which the evidence he has presented will not support and which would not alter the outcome in any event.

First, the plaintiff asserts that O'Shea "knew" that Channing had no gun. (Doc. 19 at 15). Both O'Shea and Regina, however, testified that she told him she did not know whether Channing had retrieved the gun from under the bed, so O'Shea could not have "known" that Channing did not have the gun. Once O'Shea saw Channing, he realized that Channing's weapon might be a tire tool rather than a gun, but a tire tool is an equally deadly weapon at close range.

Second, the plaintiff insists that O'Shea could see well enough to know that Channing's weapon was not a tire tool, knife or gun but a broken wooden chair spindle. (Doc. 19 at 20). This is based on Regina's testimony that their neighbor to the north had a streetlight somewhere in his yard, which was on at the time of the incident. (Regina Deposition at 39-40, 72-73). According to Regina, from where O'Shea stood "the visibility to the truck [was] clear" and "[y]ou could see the truck." (*Id*. at 73-74). The question, however, is not whether O'Shea could see the truck (its metallic surface would reflect even weak light, allowing its location to be detected) but whether, once he saw Channing as Channing charged him, he could confidently confirm, in the split-second before Channing was on him, that Channing carried only a chair spindle. There is no evidence that the neighbor's distant light was so powerful and so perfectly positioned as

to eliminate darkness, shadow and uncertainty as to the identity and dangerousness of a rapidly approaching, swinging object whose possessor was simultaneously vowing to kill O'Shea.

Third, the plaintiff notes that O'Shea described the object in Channing's hand as shiny, and he asserts that a chair spindle which is painted green cannot appear shiny. (Doc. 19 at 16, 18, 19).  This ipse dixit defies common experience, since glossy finishes are frequently used on painted furniture.  More fundamentally, it ignores that O'Shea was faced with an instantaneous threat by a charging subject swinging a weapon under dim lighting conditions.  The relative degree of shininess of the weapon says nothing about the degree of danger to which O'Shea reasonably felt exposed.

Fourth, the plaintiff suggests that O'Shea had a luxurious amount of time in which to retreat, issue warnings, and confirm that Channing was not dangerous.  (Doc. 19 at 17).  This was supposedly "more than a few seconds" although less than 30 seconds.  (*Id*. at 21).  The testimony of Regina on which the plaintiff relies states only that it "seemed like a long time" between when Zack reached O'Shea and when she heard Channing running towards O'Shea.  (Regina Deposition at 60-61, 64).  The plaintiff has presented no evidence as to the length of time between when Channing began charging O'Shea and when O'Shea fired.[3]  That leaves as uncontroverted O'Shea's testimony that Channing charged about 15 or 20 feet before O'Shea fired and that Channing was then within 10 or 15 feet of O'Shea.  (O'Shea Deposition at 13-14, 25-26; O'Shea Statement at 11).[4]  These

---

[3] Regina in her deposition apparently referred to a statement she had given the plaintiff, (Regina Deposition at 60), but the plaintiff did not place this statement in evidence.  Whatever the statement may say concerning time lapses, it is not before the Court.

[4] The plaintiff posits that O'Shea shot Channing "before the decedent came close" to him, (Doc. 19 at 7), but he identifies no evidence supporting his ipse dixit.  To the extent he relies on evidence that Regina did not see Channing before he was shot, (Doc. 19 at 17; Regina Deposition at 75-76), he offers no evidence that her position allowed her to see that Channing was not near O'Shea.  On the contrary, Regina testified she could not see anything beyond the end of the trailer.  (*Id*. at 76-77).

extremely short distances, being covered by a man proceeding at a full run, would necessarily be covered almost instantly, leaving no appreciable time for warning or retreat.

Fifth, the plaintiff denies that Channing threatened to kill O'Shea. According to the plaintiff, Channing yelled only, "Oh, no, you don't." (Doc. 19 at 3, 13, 14). Regina's actual testimony, however, was as follows:

Q.    Did you hear what Chan was yelling?

A.    Like, oh, no, something. Oh, no, you don't. I don't remember.

Q.    Do you recall whether or not he was cussing?

A.    I don't remember. I just remember that, oh, no, you don't.

(Regina Deposition at 43-44). While Regina "do[es]n't recall" Channing saying "I'm going to kill you," she confirms it is "a fair statement" that she "do[es]n't know" what Channing yelled. (*Id.* at 53). Regina therefore does not contradict O'Shea's testimony that Channing yelled, "You motherfucker, I'm going to kill you."

Sixth, the plaintiff asserts that O'Shea "never moved, stood still as a statue" before firing. (Doc. 19 at 18). What Regina actually testified was that, while she watched O'Shea the whole time, she never saw him retreat. (Regina Deposition at 75). This is consistent with O'Shea's testimony that he took a step backward but caught on a tree root, stumbled, realized he now had no time to retreat, and fired. Nor, under the split-second circumstances with which he was confronted, would a failure to attempt retreat render his use of deadly force unreasonable. The same is true of O'Shea's admitted failure to issue a warning before discharging his firearm.

Finally, the plaintiff argues that O'Shea "had no justifiable reason to interfere at all." (Doc. 19 at 20). He states that O'Shea's mission was to get Zack out of the truck so that Channing could not drive while intoxicated with Zack in the vehicle, (*id.* at 15), and he apparently concludes that, with Zack out of the truck and back with O'Shea, O'Shea's work was done and he should have left immediately before Channing charged him. But the plaintiff offers no argument or authority for the proposition that a Fourth Amendment

[10]

claim can be based on a law enforcement officer's brief delay in leaving a place he has a legal right to be.[5]  On the contrary, and as noted above, a Fourth Amendment claim depends on whether the officer uses excessive force under the circumstances presented when the force is employed.  As discussed above, O'Shea's use of deadly force was not constitutionally excessive under the circumstances he faced.

## CONCLUSION

Channing's death is unfortunate, and it might have been avoided under different circumstances.  However, under the uncontroverted facts presented on motion for summary judgment, O'Shea did not use constitutionally excessive force.  Accordingly, his motion for summary judgment is **granted**.  This action is **dismissed with prejudice**.  Judgment shall be entered accordingly by separate order.

DONE and ORDERED this 29th day of March, 2011.

s/ WILLIAM H. STEELE
CHIEF UNITED STATES DISTRICT JUDGE

---

[5] The plaintiff admits that the delay was less than 30 seconds.  (Plaintiff's Brief at 21).